IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

MICHAEL D. BENNETT, on behalf of the JJF
Management Services, Inc. Employee Stock
Ownership Plan, and on behalf of a class of all
other persons similarly situated,
    6191 Murray Terrace
    Frederick, MD 21703
    Frederick County,

          Plaintiff,               Case No.

v.

MARIANNA F. HEETER, as Administrator of
the Estate of Richard A. Heeter,
    112 Kim Acres Drive
    Mechanicsburg, PA 17055, and

CAPITAL TRUSTEES, LLC,
    1013 Mumma Road
    Lemoyne, PA 17043,

          Defendants.

## CLASS ACTION COMPLAINT

Plaintiff Michael D. Bennett, by his undersigned attorneys, on behalf of the JJF

Management Services, Inc. Employee Stock Ownership Plan, and similarly situated participants

in the Plan and their beneficiaries, alleges upon personal knowledge, the investigation of his

counsel, and upon information and belief as to all other matters, as to which allegations he

believes substantial evidentiary support will exist after a reasonable opportunity for further

investigation and discovery, as follows:

1

**BACKGROUND**

1.      Plaintiff Michael D. Bennett ("Plaintiff") brings this suit against Marianna F. Heeter, as Administrator of the Estate of Richard A. Heeter, and Richard A. Heeter's company Capital Trustees, LLC ("CapTrustees," and together with Richard A. Heeter, "the Trustee"). The Trustee served as the fiduciary trustee for the JJF Management Services, Inc. Employee Stock Ownership Plan (the "Plan" or the "ESOP") at the time the Plan acquired shares of JJF Management Services, Inc. ("JJF" or the "Company," a.k.a. J.J.F. Management Services, Inc.) in 2023.

2.      Plaintiff is a participant, as defined by ERISA § 3(7), 29 U.S.C. § 1002(7), in the Plan who was vested in shares of JJF allocated to his account in the Plan.

3.      This action is brought under Sections 406, 409, and 502(a)(2) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1106, 1109, 1132(a)(2), for losses suffered by the Plan and its participants caused by the Trustee when it caused the Plan to engage in ERISA prohibited transactions in connection with its leveraged purchase of JJF stock from the selling shareholders, and other plan-wide relief. Specifically, the Trustee caused the Plan to engage in prohibited transactions under ERISA Section 406(a)(1)(A), (B) and (D), 29 U.S.C. §§ 1106(a)(1)(A), (B) and (D), when it caused the Plan to purchase Company stock from the selling shareholders and transfer assets of the Plan to them, and financed that purchase with loans from the selling shareholders and the Company, who were parties in interest to the Plan.

4.      As alleged below, the Plan, Plaintiff, and all Plan Participants have been injured and participants deprived of hard-earned retirement benefits resulting from the Trustee's violations of ERISA.

2

5. At all relevant times, JJF was a privately held company, the Plan's sponsor, and a party in interest to the Plan. JJF established the Plan to be retroactively effective as of August 1, 2021.

6. On January 31, 2023, the Plan, through its trust, the JJF Management Services, Inc. Employee Stock Ownership Trust ("ESOT"), purchased from the party in interest selling shareholders, directly or indirectly, 1,000,000 shares of JJF's common stock for $441,963,472, which was financed, as explained further below, with loans from the selling shareholders and the Company (the purchase and loan transactions together, the "ESOP Transaction" or "Transaction"). That purchase reportedly made JJF "a 100% Employee-Owned Company."

7. The ESOP paid more than fair market value for JJF stock for several reasons as detailed below. Among other things, the Trustee and its financial advisor caused the ESOP to pay a control value even though the ESOP did not obtain control of JJF. And the Trustee and its advisor applied a discount for lack of marketability premised on the ESOP obtaining put rights that it did not receive. The Trustee and its financial advisor relied on unreasonably optimistic financial projections. These valuation errors caused the ESOP to pay tens of millions of dollars in excess of fair market value.

8. The Trustee represented the Plan and its participants as fiduciary trustee in the ESOP Transaction. It had sole and exclusive authority to negotiate the terms of the ESOP Transaction and to authorize the Transaction on the Plan's behalf. The stock and loan transactions that the Trustee caused the Plan to enter into with parties in interest under ERISA § 3(14), 29 U.S.C. § 1002(14), were prohibited transactions under ERISA § 406(a), 29 U.S.C. § 1106(a).

9.      Through this action, Plaintiff seeks to enforce his rights under ERISA and the Plan, specifically, to recover the losses incurred by the Plan resulting from the Trustee causing prohibited transactions, and equitable relief, including recovery of improper profits realized by the Trustee. Plaintiff requests that Defendants be required to restore any losses to the Plan arising from the Trustee's ERISA violations, Defendants be ordered to disgorge to the Plan any improper profits, and any monies recovered for the Plan to be allocated to the accounts of the Class members.

## JURISDICTION AND VENUE

10.      This action arises under Title I of ERISA, 29 U.S.C. §§ 1001 *et seq.*, and is brought by Plaintiff under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), to require Defendants to make good to the Plan losses resulting from the Trustee's violations of the provisions of Title I of ERISA, to restore to the Plan any profits that have been made by Defendants through the receipt or use of Plan assets in violation of ERISA, and to obtain other appropriate equitable relief and legal remedies in order to redress violations and enforce the provisions of ERISA.

11.      This Court has subject matter jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1), and it has original jurisdiction pursuant to 28 U.S.C. § 1331.

12.      Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this District, and because some of the events or omissions giving rise to the claims occurred in this District. The Plan is administered in Rockville, Maryland.

## PARTIES

13.      **Plaintiff Michael D. Bennett** is and has been a Plan participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), since the effective date of the Plan, August 1, 2021. Plaintiff

4

resides in Frederick, Maryland. He was a Finance Manager at Fitzgerald Auto Mall, Inc., a subsidiary of JJF. He was employed there from on or about June 28, 2010 to October 19, 2023. At the time he left employment at JJF, he was 100% vested in shares of JJF in his Plan account.

14.     **Defendant Marianna F. Heeter** is Administrator of the Estate of Richard A. Heeter.

15.     Richard A. Heeter was the Managing Director, Principal, and Founder of CapTrustees. Richard A. Heeter's business address was at Capital Trustees, LLC, 1013 Mumma Road, Lemoyne, Pennsylvania 17043.

16.     Richard A. Heeter was the trustee of the Plan at the time of the ESOP Transaction. Richard A. Heeter and JJF made and entered into the ESOT's Trust Agreement on July 31, 2022, and it was made effective as of August 1, 2021. As the Plan's trustee, Richard A. Heeter had discretion to authorize and negotiate the ESOP Transaction on behalf of the Plan. The Trust Agreement named Richard A. Heeter as a fiduciary as ESOT trustee.

17.     **Defendant Capital Trustees, LLC** ("CapTrustees") is a Pennsylvania Limited Liability Company founded in 2012. CapTrustees bills itself as "an independent trustee and fiduciary" that "serves as ongoing trustee to over 40 ESOP companies" and "serves as transaction trustee." CapTrustees' headquarters is at 1013 Mumma Road, Lemoyne, Pennsylvania 17043.

18.     Defendant CapTrustees was at all relevant times Richard A. Heeter's company. CapTrustees was the trustee of the Plan at the time of the ESOP Transaction. As trustee, CapTrustees had discretion to authorize and negotiate the ESOP Transaction on behalf of the Plan. CapTrustees provides a team to execute ESOP transactions, office space, a routine due diligence process, and insurance. CapTrustees advertises: "The professional team at Capital

5

Trustees has extensive business experience, which allows them to efficiently and effectively fulfill their fiduciary duties." CapTrustees acted in the ESOP Transaction through Richard A. Heeter.

19.     At the time of the ESOP Transaction, the Trustee was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because it was the trustee within the meaning of ERISA § 403(a), 29 U.S.C. § 1103(a), and because it exercised discretionary authority or discretionary control respecting management of the Plan, and/or exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

**FACTUAL ALLEGATIONS**

**JJF and its Affiliated Companies**

20.     JJF Management Services, Inc. ("JJF" or the "Company") is a Rockville, Maryland-based management company that oversees the property and operations management of automobile dealerships and vehicle rental facilities, which with its subsidiaries largely operates under the trade name Fitzgerald Auto Mall (and Malls). Current and/or former subsidiaries and/or affiliates include, but are not limited to, Fitzgerald Auto Mall, Inc. (Frederick); Fitzgerald Buick, Inc. (Rockville); CDOHY, Inc. (Rockville); Fitzgerald Lakeforest Motors, Inc. (Gaithersburg); LFO, Inc. (Gaithersburg); Wheaton Motor City, Inc. (Wheaton); FOC, Inc. (Annapolis); FALPM, Inc. (Lexington Park); FCC-HAG, LLC (Hagerstown); FCDJR-HAG, LLC (Hagerstown); Fitzgerald Motors, Inc. (Pennsylvania); and FitzGS, Inc.

21.     John J. Fitzgerald, Jr. ("Jack Fitzgerald") was the founder of "The Fitzgerald Automotive Family" in 1966, and he was the founder of JJF. At the time of the ESOP Transaction, Jack Fitzgerald was JJF's primary principal, President, and Chairman of the Board

6

of Directors. He was a Plan fiduciary with the power to select, retain, and remove other fiduciaries including the Plan trustee and the ESOP Committee.

22.    Prior to their sale of stock to the Plan in the ESOP Transaction, JJF was owned by members of the Fitzgerald Family including Jack Fitzgerald; his sister Dorothy ("Dottie") M. Fitzgerald; his son John J. Fitzgerald, III; his daughter Kathleen (Fitzgerald) Iceberg; James William ("Bill") Cash, his son or stepson; and Margaret M. Fitzgerald.

23.    Jack Fitzgerald, Dottie Fitzgerald, John J. Fitzgerald, III, and Bill Cash were each directors, officers, and/or employees of JJF and/or of an Affiliated Company whose qualifying employees are covered by the Plan (or individuals having powers or responsibilities similar to those of directors or officers) at the time of the ESOP Transaction. Therefore they were parties in interest to the Plan under ERISA § 3(14)(H), 29 U.S.C. § 1002(14)(H).

24.    Jack Fitzgerald was also a party in interest under ERISA § 3(14)(H) as a 10 percent or more shareholder, directly or indirectly, and as a fiduciary of the Plan.

25.    To the extent the selling shareholders may have included additional persons—*i.e.*, additional to Jack Fitzgerald, Dottie Fitzgerald, John J. Fitzgerald, III, Kathleen Fitzgerald Iceberg, Bill Cash, and Margaret M. Fitzgerald—they were also, on information and belief, directors, officers, and/or employees of JJF and/or of an Affiliated Company whose qualifying employees are covered by the Plan (or individuals having powers or responsibilities similar to those of directors or officers) at the time of the ESOP Transaction.

26.    The selling shareholders were parties in interest to the Plan under ERISA § 3(14), 29 U.S.C. § 1002(14), at the time of the ESOP Transaction as an officer, employee, and/or director of JJF and/or an Affiliated Company whose qualifying employees are covered by the Plan (or individuals having powers or responsibilities similar to those of directors or officers);

7

and/or as a 10 percent or more selling shareholder; and/or as a fiduciary of the Plan; and/or as a "relative," within the meaning of ERISA § 3(15), 29 U.S.C. § 1002(15).

27.    JJF was formed in Maryland on December 12, 1974. Following forfeiture of its charter, JJF filed Articles of Revival on July 2, 1986. As of February 1, 2023, the day after the ESOP Transaction, JJF became and is an S corporation.

28.    JJF established the Plan with a retroactive effective date of August 1, 2021.

29.    Qualifying employees of JJF and its Affiliated Companies who participate in the Plan are covered under the Plan.

30.    JJF is and was from the inception of the Plan the sponsor of the Plan within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B).

31.    The Plan's most recent Form 5500 Annual Return/Report of Employee Benefit Plan for the 2023 plan year running from February 1, 2023 through January 31, 2024, reports that JJF's address, in its capacities as Plan Sponsor and Plan Administrator, is at 11411 Rockville Pike, Rockville, Maryland 20852-5911. JJF reported this same address on its Form 5500 for the short second ESOP year (2022 plan year) running from August 1, 2022 through January 31, 2023.

32.    Although the Plan was made effective as of August 1, 2021, JJF did not file a Form 5500 for the first plan year running from August 1, 2021 through July 31, 2022.

33.    JJF is and was from the inception of the Plan the Plan's administrator within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A), and a Named Fiduciary of the Plan within the meaning of ERISA § 402(a), 29 U.S.C. § 1102(a). The Company is responsible for the administration of the Plan.

34.     JJF is and was an ERISA fiduciary to the Plan at all relevant times because it is a Named Fiduciary of the Plan; it is the Plan Administrator; and it possesses and exercised through the Board of Directors the fiduciary power to appoint and remove other Plan fiduciaries, including the ESOT trustee and the ESOP Committee.

35.     As a Plan fiduciary, and an employer whose employees are covered by the Plan, JJF is and was at the time of the ESOP Transaction a party in interest to the Plan under ERISA § 3(14)(A) and (C), 29 U.S.C. § 1002(14)(A) and (C).

**The Plan and the ESOP Transaction**

36.     The Plan is a pension plan within the meaning of ERISA § 3(2), 29 U.S.C. § 1002(2), and is subject to ERISA pursuant to ERISA § 4(a)(1), 29 U.S.C. § 1003(a)(1). It is a defined contribution plan, under which a separate individual account is maintained for each participant.

37.     The Plan is designed and operates as an employee stock ownership plan (ESOP) within the meaning of Internal Revenue Code Section 4975(e)(7) and Section 407(d)(6) of ERISA, 29 U.S.C. § 1107(d)(6). The Plan was designed to invest primarily in the employer securities of JJF. The Plan's principal asset was JJF common stock at all times since the ESOP Transaction. JJF stock is not and never was readily tradeable on an established securities market.

38.     On January 31, 2023, the Plan, through its ESOT, purchased from the selling shareholders 1,000,000 shares of JJF common stock for $441,963,472 in the ESOP Transaction.

39.     On January 31, 2023, JJF became employee-owned through the ESOP and its ESOT. The stock purchased by the ESOT represented 100% of the issued and outstanding shares of the Company's common stock.

9

40.    The Plan's purchase of the JJF shares was financed by loans from the selling shareholders. In January 2023, the Plan entered into a loan agreement for $89,321,858 (Loan 1) to partially finance the purchase of the Company's common stock from certain former shareholders of the Company. Concurrently, to finance the remaining balance of the purchase of the stock from the former shareholders, the Plan also entered into a separate loan agreement in the amount of $330,678,142 (Loan 2) with the senior seller, Jack Fitzgerald. The proceeds of Loan 1 and Loan 2 were used to purchase 1,000,000 shares of the Company's common stock.

41.    Effective October 20, 2023, Loan 1 and Loan 2 were superseded and replaced with a new loan agreement (Replacement Loan Agreement) in the amount of $441,963,472 between the Plan and the Company, inclusive of a purchase price adjustment of $16,508,475 and a post-closing adjustment of $5,454,997. The agreement provides for the loan to be repaid over 39 years.

42.    The Notes to Financial Statements to the Plan's 2022–2023 Forms 5500 report that the Plan's investments in Company common stock "qualify as party-in-interest transactions."

43.    The Plan Document is to be "construed, administered and governed in all respects in accordance with ERISA and to the extent not superseded by federal law, in accordance with the laws of the State of Maryland."

44.    Likewise, the ESOT's Trust Agreement is to be "construed and administered according to the laws of the State of Maryland to the extent that the laws of the United States of America do not preempt such laws."

45.    Effective as of December 12, 2024, the Plan was amended in the "Second Amendment" to include a bogus forum selection clause designating the United States District

10

Court for the Middle District of Florida, Tampa Division. The Plan is administered in Rockville, Maryland. JJF is headquartered in Rockville, Maryland and its dealerships and employees are predominantly in Maryland. Plaintiff resides in Frederick, Maryland. Defendant Trustee is and was headquartered in Pennsylvania and had no office in Florida. The Plan's current trustees, who are not defendants, reside or may be found in Maryland.

46. The forum selection clause was added by the Second Amendment to interfere with participants, and Plaintiff Bennett specifically, seeking to exercise their rights under ERISA and the Plan by designating a forum that is inconvenient, far from the parties and witnesses, and that applies an Eleventh Circuit exhaustion of administrative remedies requirement that would needlessly delay the administration of justice and is not applied in the Fourth Circuit in this action alleging statutory breaches rather than a claim for benefits under the Plan. The Plan was so amended only after Plaintiff made a request for documents to the Plan Administrator under ERISA § 104(b)(4), 29 U.S.C. § 1024(b)(4), by letter dated November 6, 2024, putting JJF on notice of potential litigation.

47. The Second Amendment was made after Plaintiff Bennett ceased working at JJF and accruing benefits under the Plan. He did consent to it or receive consideration for it.

48. Plaintiff received the Second Amendment only after his claims accrued, when Lars C. Golumbic of Groom Law Group, counsel to JJF, responded by letter dated January 10, 2025, to his request for documents.

49. The United States District Court for the Middle District of Florida, Tampa Division is not a proper forum as it has no connection to the parties, the Plan, or the events and occurrences giving rise to Plaintiff's claims.

11

50. The Second Amendment's forum selection, Plan administrative remedies, and other provisions attempting to preclude this action from proceeding immediately in the United States District Court for the District of Maryland, which is the proper venue under ERISA § 502(e), 29 U.S.C. § 1132(e), are unenforceable, invalid, and void.

**The Fiduciary Trustee**

51. JJF, by its Board of Directors, appointed the Trustee as trustee of the Plan's ESOT prior to the ESOP Transaction at a time when the selling shareholders owned and controlled the Company. The Trustee had sole and exclusive authority to negotiate and approve the ESOP Transaction on behalf of the Plan, including the price the Plan paid for JJF stock. Therefore, the seller-side in the ESOP Transaction—and specifically Jack Fitzgerald as JJF's President, Chairman, and Founder, as head of the Fitzgerald family, and as signatory to the Trust Agreement—appointed the buyer-side counter-party trustee in the Transaction. An unconflicted independent fiduciary did not make the appointment.

52. As trustee for the Plan, it was the Trustee's duty to ensure that any transactions between the Plan and the selling shareholders and between the Plan and JJF, including acquisitions of JJF stock by the Plan and loans to the Plan, were fair and reasonable and to ensure that the Plan paid no more than fair market value.

53. The ESOT's Trust Agreement provides, in relevant part: "the Trustee shall have full and complete investment authority and responsibility with respect to the purchase, retention, sale and pledge of Company Stock. The Trustee shall have the authority to contract or otherwise enter into transactions for the purpose of acquiring or selling Company Stock, including transactions with the Company or any Company shareholder, and to borrow money from any lender (including the Company) to finance the acquisition of Company Stock, giving its Note as

12

Trustee, with such reasonable interest and security for the loan as may be appropriate or necessary (provided that such borrowing complies with the Plan)."

54. The Trust Agreement was made and entered into by and between JJF and Richard A. Heeter. The Trust Agreement names Richard A. Heeter as "an individual acting solely in his fiduciary capacity as trustee."

55. The Trust Agreement further provides, in relevant part: "All purchases and sales of Company Stock shall be made at a price not less favorable to the Trust than fair market value as determined in good faith by the Trustee . . . . Any purchases or sales of Company Stock that are not readily tradeable on an established securities exchange shall be made with the advice of an Independent Appraiser and in accordance with any applicable requirements of ERISA."

56. Pursuant to the Plan Document, the Plan "includes the Plan and Trust Agreement."

**The Plan was Injured by its Overpayment for Company Stock in the ESOP Transaction**

57. On January 30, 2023, Articles of Amendment to JJF's Articles of Incorporation were approved by the shareholders and advised by the Board of Directors, with the amendment to be effective as of January 31, 2023, the day of the ESOP Transaction.

58. Article SIXTH to the Articles of Incorporation, as amended by the Articles of Amendment, gave the selling shareholders, and Jack Fitzgerald particularly, continued control over JJF's Board of Directors after the ESOP Transaction. The Sellers' Representative (Jack Fitzgerald) was empowered to nominate and cause JJF to appoint three of the five directors on behalf of the Sellers, and one of those directors had to be Jack Fitzgerald. The Articles of Amendment further required that Jack Fitzgerald's cohorts Gregg J. Steinbarth and Walter J. Skipper were to be initial directors.

13

59.    The Articles of Amendment provide, *inter alia*:

> SIXTH: For so long as any amounts remain outstanding under the Applicable Notes, the size of the Board shall be set at five directors, and the Representative, on behalf of the Sellers, shall be entitled to nominate and cause the Company to appoint three individuals to the Board of Directors (one of which shall be the Representative) to serve as directors (the "Board Representatives"), subject to satisfaction of all legal and governance requirements regarding service as a director of the Company and subject to that certain Investor Rights Agreement. The initial Board Representatives shall be John J. Fitzgerald, Jr., Walter J. Skipper and Gregg J. Steinbarth, who shall also serve as members of the Compensation Committee of the Board of Directors as of the Effective Time. The Representative shall also be entitled to nominate and cause the Company to appoint replacements to fill any vacancies in such Board Representatives directorship at any time; provided that any such nominee shall be reasonably acceptable to the Company, it being understood that such acceptance shall be based on factors such as affiliation, knowledge and experience and shall not be unreasonably withheld. . . . The Company's nominating committee shall recommend to the Board of Directors that such persons designated by the Representative to be the Board Representatives (or any successor designated by the Representative and reasonably acceptable to the Company) be included in the slate of nominees recommended by the Board of Directors to shareholders for election as directors at each annual meeting of shareholders of the Company at which such person's term expires. The Company shall solicit proxies for the Board Representative to the same extent as it does for any of its other nominees to the Board of Directors. (Capitalized terms in this Article SIXTH shall have such meaning as ascribed to them as set forth in that certain Stock Purchase Agreement dated as January 31, 2023.)

60.    The "Representative" referenced in the Articles of Amendment who was "entitled to nominate and cause the Company to appoint three individuals to the Board of Directors" "on behalf of the Sellers" was Jack Fitzgerald. Jack Fitzgerald thus had the power to appoint the majority of the members of the JJF Board of Directors, and he was himself a Director. The Articles of Amendment hardwired Jack Fitzgerald's choices by requiring that Jack Fitzgerald, Gregg J. Steinbarth, and Walter J. Skipper be the initial post-ESOP Transaction directors.

61.    Gregg J. Steinbarth began working at JJF in February 1999, and is and has been a long-term Director, General Counsel, and Assistant Secretary of JJF. He was a JJF Director for

many years prior to the ESOP Transaction. Steinbarth has also served as a Director, Assistant Secretary, and in-house counsel at Rent-A-Wreck of America, Inc., for which JJF was the sole shareholder.

62.    Walter J. Skipper, an attorney, did work for Rent-A-Wreck and/or JJF, and with Jack Fitzgerald, Bill Cash, and Gregg J. Steinbarth.

63.    In addition to his roles as Chairman and President of JJF, Jack Fitzgerald has been Chairman of the Board of Directors at Rent-A-Wreck. Bill Cash has been President at Rent-A-Wreck and a Vice President at Fitzgerald Auto Malls.

64.    Jack Fitzgerald also had the power to direct the post-Transaction ESOT trustees on appointment of members of the JJF Board of Directors pursuant to the Plan Document. Participants in the Plan did not and do not have the power to vote for members of the Board of Directors. The ESOT trustees have that vote. However, an ESOP Voting Committee directed the ESOT trustees how to vote. Jack Fitzgerald was the sole member of the ESOP Voting Committee. This means the trustees had no discretion to vote on Board members and Jack Fitzgerald controlled the Board and the shareholder vote even after he sold all his stock in the Company.

65.    Following the ESOP Transaction, Jack Fitzgerald also controlled the ESOP trustees who succeeded Defendant Trustee immediately after the ESOP Transaction because he controlled the Board, which appoints the ESOT trustees. Jack Fitzgerald further controlled the trustees because he appointed persons beholden to him and other selling shareholders.

66.    The Trust Agreement states: "While Richard Heeter will be the Trustee for purposes of the ESOP purchase transaction, he will be replaced by Rob Smith, David Jenkins

15

and Gregg Steinbarth immediately following the transaction. Going forward, the three individuals will be the trustees for the ESOP."

67. The Plan's Summary Plan Description as of December 2024 ("SPD") likewise identifies Robert M. Smith, Jr., David Jenkins, and Gregg J. Steinbarth as the Plan Trustees, and states the trustees are appointed by the Board of Directors.

68. The SPD states that the current trustees Robert M. Smith, Jr., David Jenkins, and Gregg J. Steinbarth may be contacted at: JJF Management Services, Inc., 11411 Rockville Pike, Rockville, Maryland 20852.

69. Robert M. Smith, Jr. has been working at JJF since 1989, was Vice President at the time of the ESOP Transaction, and since September 22, 2023 has been the President. He is a Director of JJF and/or an Affiliated Company.

70. David Jenkins has been working at JJF since in or about 1987, was Vice President of Operations at the time of the ESOP Transaction, and since September 22, 2023 has been the Chief Operating Officer (COO). He is a Director of JJF and/or an Affiliated Company.

71. Jack Fitzgerald continued to be Chairman of the Board at JJF after Smith took over as President in September 2023.

72. The post-Transaction ESOP trustees—Smith, Jenkins, and Steinbarth—were not independent trustees whose only role was to represent the interests of the Plan and its participants, but rather long-term associates of Jack Fitzgerald and the Fitzgerald Family. Their roles not only as Plan trustees but also as directors, officers, and counsel belie their independence from Jack Fitzgerald and the other selling shareholder members of the Fitzgerald Family.

73. In fact the Plan's 2023 Form 5500 reports (emphasis added): "The Plan is managed by 3 *non-independent* Trustees."

16

74.     Dottie Fitzgerald, Vice President and former Director at JJF and Jack Fitzgerald's sister, noted in Bethesda Magazine that the new "leaders" Smith and Jenkins had "been with us since they were kids." A September 28, 2023, press release stated: "Long-tenured executives Smith and Jenkins have been a part of the Fitzgerald family for over 30 years."

75.     By design of Company, ESOP Transaction, and ESOP governing documents, JJF has remained under the control of the selling shareholders after the ESOP Transaction.

76.     Despite buying 100% of the Company stock, the Plan and its participants did not take control of JJF from the selling shareholders following the ESOP Transaction. The design of the ESOP Transaction and Company control features denied the Plan the control it should have received for its $441 million purchase.

77.     The Trustee valued the JJF stock on a control basis by using an industry and/or an expected capital structure in the income approach analysis rather than the Company's actual capital structure. This type of analysis yields a control value of the Company stock because a lack of control equity interest would not be able to change the capital structure of the Company. Only a controlling equity interest has the ability to change the capital structure of the Company. The Plan did not obtain control of the Company, as explained above, because Jack Fitzgerald and other selling shareholders maintained control over the Board and, through the Board, JJF. Accordingly, a valuation discount for lack of control should have been applied to the value of the Company stock, but this discount was not applied. Consequently, the Plan paid more than fair market value for the stock.

78.     The Trustee's appraisal of JJF stock in the ESOP Transaction was based upon a combination of income and market valuation approaches. JJF management provided data from historical and projected financial information of the Company to the Trustee for the valuation of

17

JJF stock in the ESOP Transaction. Forecasts prepared by JJF management were used in the valuation methods employed by the Trustee and its financial advisor. The projections were unreasonably optimistic and aggressive. In addition, the valuation used "comparable" publicly traded companies that were significantly different than JJF in terms of financial size, geographic location, product offerings, and different markets served. Using guideline public companies to determine the fair market value of JJF had the effect of improperly increasing the indicated value because the public companies were too different from JJF to provide a reliable indication of value. All of this information was used to establish an excessive purchase price of $441,963,472 for the Company stock.

79.    The Trustee did not adequately challenge information provided by JJF management or the valuation techniques of its financial advisor and therefore failed to negotiate for the true, lower fair market value price of JJF stock as of the date of the ESOP Transaction.

80.    The Trustee failed to apply a sufficient discount for lack of marketability (DLOM) to its valuation in the ESOP Transaction because it failed to sufficiently account for the lack of marketability for the private stock that was purchased by the ESOT. The valuation applied an insufficient DLOM because Plan participants, beneficial owners rather than legal owners, have a right to have the Company or the Trustee buy any shares of JJF stock distributed to participants that is not publicly traded (the Put Option). As stated in the Notes to Financial Statements to the Plan's 2022–2023 Forms 5500 (emphasis added): "The purpose of the put option is to ensure that *the participant* has the ability to ultimately obtain cash."

81.    But the ESOT was the purchaser in the ESOP Transaction and the participants' sales to the Company or ESOT do not reduce the lack of marketability to the ESOT of the stock the ESOT owns. In other words, the ESOP's acquisition price was for more than fair market

18

value because the DLOM applied in the transaction was premised on put rights that did not run to the buyer. In addition, the Plan's lack of control over JJF made the stock the Plan owned even less marketable. The Plan overpaid for JJF stock in the ESOP Transaction due to the Trustee's improper application of a DLOM of 5%, where restricted stock studies show the DLOM should have been 10–30%.

82.     The Plan permits "Synthetic Equity," which means: "any stock option, warrant, restricted stock, deferred issuance stock right, or similar interest or right that gives the holder the right to acquire or receive stock of the S Corporation in the future" and, subject to Regulations, "a stock appreciation right, phantom stock unit, or similar right to a future cash payment based on the value of such stock or appreciation in such value and 'non-qualified deferred compensation' that is treated as synthetic equity in accordance with Treas. Reg. 1.409(p)-1(f)."

83.     Synthetic equity is usually granted to high level executives by the board of directors. Here, the selling shareholders controlled the Board and included high level executives in the relevant period.

84.     When synthetic equity is granted, it dilutes the value of company shares held by ESOP participants and transfers that value to those persons holding the synthetic equity. Thus when synthetic equity is granted, it reduces the value of the JJF shares owned by the Plan. This either harms the economic interest of Plan participants or, if the synthetic equity is not properly taken into account in the valuation of JJF stock, the stock is reported at inflated values.

85.     A rational buyer under no compulsion to purchase JJF under terms like these (*i.e.*, a Board controlled by the selling shareholders, who could dilute the value of all JJF stock by granting themselves synthetic equity) would not have purchased the company stock that the

19

ESOP was forced to purchase, or would have demanded a significant discount in the price of the stock to account for these defects of ownership.

86.    Warrants, a type of synthetic equity permitted under the Plan, may be issued to selling shareholders in or following an ESOP transaction. Warrants can allow selling shareholders to receive an amount over and above fair market value for their companies, which can be as much as 20 or 30 percent of the entire business, which over the course of a decade can be worth more than the entire business was worth the day the selling shareholders sold it. The value of the warrant is manipulable because a warrant is the right to buy shares in the business at a price that is agreed-upon. Warrants thus may give selling shareholders who take debt for the sale of their companies in ESOP transactions compensation above and beyond the amount of the interest rate on the loan paid by an ESOP.

87.    The Plan overpaid for JJF, and selling shareholders were permitted to receive improper profits, as a result of warrants and/or other synthetic equity issued to them. A rational buyer under no compulsion to purchase JJF would not have agreed to the warrants upon its purchase of JJF stock.

88.    In breach of its duties as fiduciary and trustee under ERISA, the Trustee caused the Plan to engage in prohibited transactions. The Plan suffered losses as a result of the ERISA prohibited transactions alleged herein, in an amount to be determined following discovery and expert analysis of non-public information concerning the Trustee's and its financial advisor's valuation and due diligence methodologies, JJF financials and growth projections, and other documents and information that were considered or should have been considered in the ESOP Transaction.

89.    As a result of the prohibited transactions, Plaintiff and the Plan's participants, whose losses are coterminous with the Plan's, received diminished stock allocations, saw their Plan take on excessive debt to finance the Transaction, and suffered monetary losses to their individual Plan accounts.

90.    The Trustee is liable to the Plan for the difference between the price paid by the Plan and the fair market value of JJF shares at the time of the ESOP Transaction.

## CLAIMS FOR RELIEF

## COUNT I

**Causing Prohibited Transactions Forbidden by ERISA § 406(a), 29 U.S.C. § 1106(a), Against Marianna F. Heeter, as Administrator of the Estate of Richard A. Heeter, and Capital Trustees, LLC**

91.    Plaintiff incorporates the preceding paragraphs as though set forth herein.

92.    ERISA § 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A), prohibits a plan fiduciary, here the Trustee, Richard A. Heeter and CapTrustees, from causing a plan, here the Plan, to engage in a sale or exchange of any property, here JJF stock, with a party in interest, here the selling shareholders, as took place in the ESOP Transaction.

93.    ERISA § 406(a)(1)(B), 29 U.S.C. § 1106(a)(1)(B), prohibits the Trustee from causing the Plan to borrow money from a party in interest, here the selling shareholders and JJF, as took place in the ESOP Transaction.

94.    ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), prohibits the Trustee from causing the Plan to engage in a transaction that constitutes a direct or indirect transfer to a party in interest, here the selling shareholders, of any assets of the Plan, as took place in the ESOP Transaction with the transfer of Plan assets to the selling shareholders for stock.

95.     The stock and loan transactions between the Plan and the parties in interest were authorized by the Trustee in its capacity as trustee for the Plan.

96.     The Trustee caused the Plan to engage in prohibited transactions in violation of ERISA § 406(a), 29 U.S.C. § 1106(a), in the ESOP Transaction.

97.     ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by Title I of ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach, and to restore to the plan any profits of the fiduciary which have been made through the use of assets of the plan by the fiduciary, and additionally is subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

98.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participant to bring a suit for relief to a plan under ERISA § 409.

99.     The Trustee has caused losses to the Plan by the prohibited transactions in an amount to be proved specifically at trial.

**CLASS ACTION ALLEGATIONS**

100.    Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b), on behalf of the following class:

> All vested participants in the JJF Management Services, Inc. Employee Stock Ownership Plan ("Plan") and the beneficiaries of such participants as of the date of the January 31, 2023 ESOP Transaction or any time thereafter. Excluded from the Class are the shareholders who sold their JJF Management Services, Inc. ("JJF") stock to the Plan, directly or indirectly, and their immediate families; the directors and officers of JJF and their immediate families; and legal representatives, successors, and assigns of any such excluded persons.

101. The Class is so numerous that joinder of all members is impracticable. Although the exact number and identities of Class members are unknown to Plaintiff at this time, the Plan's most recent Form 5500 reports that as of January 31, 2024, there were 2,058 participants in the Plan.

102. Questions of law and fact common to the Class as a whole include, but are not limited to, the following:

    i.    Whether Richard A. Heeter and CapTrustees served as trustee in the Plan's acquisition of JJF stock;

    ii.    Whether Richard A. Heeter and CapTrustees were ERISA fiduciaries of the Plan;

    iii.    Whether Richard A. Heeter and CapTrustees caused the Plan to engage in prohibited transactions under ERISA by permitting the Plan to purchase JJF stock from, take loans from, and transfer assets of the Plan to, parties in interest;

    iv.    Whether JJF was a party in interest and gave a loan to the Plan;

    v.    Whether the selling shareholders were parties in interest;

    vi.    Whether the selling shareholders gave loans to the Plan;

    vii.    The amount of losses suffered by the Plan and its participants as a result of the Trustee's ERISA violations; and

    viii.    The appropriate relief for Richard A. Heeter and CapTrustees' violations of ERISA.

103. Plaintiff's claims are typical of those of the Class. For example, Plaintiff, like other Plan participants in the Class, suffered a diminution in the value of his Plan account

because the Plan paid above fair market value and took on an excessive loan for JJF stock, resulting in his being allocated fewer shares of stock, and he continues to suffer such losses in the present because the Trustee failed to correct the overpayment by the Plan.

104.   Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel competent and experienced in complex class actions, ERISA, and employee benefits litigation.

105.   Class certification of Plaintiff's Claims for Relief for the alleged violations of ERISA is appropriate pursuant to Fed. R. Civ. P. 23(b)(1) because adjudications with respect to individual Class members would as a practical matter be dispositive of the interests of non-party Class members, and/or because the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for Defendants.

106.   The names and addresses of the Class members are available from the Plan. Notice will be provided to all members of the Class to the extent required by Fed. R. Civ. P. 23.

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays for judgment against Defendants and for the following relief:

A.   Declare that the Trustee caused the Plan to engage in prohibited transactions and thereby breached its duties under ERISA;

B.   Order Defendants to make good to the Plan and/or to any successor trust(s) the losses resulting from the violations of ERISA and disgorge any profits they made through use of assets of the Plan;

C.   Order that Defendants provide other appropriate equitable relief to the Plan and its participants and beneficiaries, including but not limited to surcharge, providing an

accounting for profits, and imposing a constructive trust and/or equitable lien on any funds wrongfully held by Defendants;

D. Order the proceeds of any recovery for the Plan to be allocated to the accounts of the class members to make them whole for any injury that they suffered as a result of the breaches of ERISA in accordance with the Court's declaration;

E. Order the allocation to the accounts of the class members of the additional shares of stock that would have been allocated but for the Plan's overpayment on company stock and Defendants' breaches of ERISA;

F. Award Plaintiff reasonable attorneys' fees and costs of suit incurred herein pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and/or for the benefit obtained for the common fund;

G. Enjoin Defendants from dissipating any of the proceeds they received from the Transaction held in their actual or constructive possession until the Plan participants' rights can be adjudicated;

H. Enjoin Defendants from transferring or disposing of any of the proceeds they received from the Transaction to any person or entity, which would prejudice, frustrate, or impair the Plan's and Plan participants' ability to recover the same;

I. Order Defendants to pay prejudgment and post-judgment interest;

J. Certify this action as a class action pursuant to Fed. R. Civ. P. 23, certify the named Plaintiff as class representative, and his counsel as class counsel; and

K. Award such other and further relief as the Court deems equitable and just.

25

Dated: July 29, 2025

**BAILEY & GLASSER LLP**

*/s/ Cary L. Joshi*
Cary L. Joshi (MD Bar No. 1806070002)
Gregory Y. Porter (*pro hac vice* to be filed)
Brian A. Glasser (*pro hac vice* to be filed)
Ryan T. Jenny (*pro hac vice* to be filed)
1055 Thomas Jefferson Street, NW
Suite 540
Washington, DC 20007
Telephone: (202) 463-2101
Facsimile: (202) 463-2103
cjoshi@baileyglasser.com
gporter@baileyglasser.com
bglasser@baileyglasser.com
rjenny@baileyglasser.com

*Attorneys for Plaintiff Michael D. Bennett*